# EXHIBIT A

1   Claudia Center, SB # 158255
    ccenter@dredf.org
2   Sydney Pickern, SB # 303908
    spickern@dredf.org
3   Malhar Shah, SB # 318588
    mshah@dredf.org
4   Disability Rights, Education, and Defense Fund
    3075 Adeline St. #210
5   Berkeley, CA 94703
    Telephone: (510) 644-2555
6   Fax: (510) 841-8645

7   Jinny Kim, SB# 208953
    jkim@legalaidatwork.org
8   Rachael Langston, SB# 257950
    rlangston@legalaidatwork.org
9   Nora Cassidy, SB# 321519
    ncassidy@legalaidatwork.org
10  Legal Aid at Work
    180 Montgomery St., Suite 600
11  San Francisco, CA 94104
    Telephone: (415) 864-8848
12  Fax: (415) 593-0096

13  *Attorneys for Plaintiffs*

14
                    **UNITED STATES DISTRICT COURT**
15
                   **NORTHERN DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17 KARA GORDON, *et al.*, | Case No.: 3:20-cv-06442-LB |
| 18              Plaintiffs, | |
| 19 vs. | Plaintiffs' [Proposed] Surreply in Support of Motion for Temporary Restraining Order and Preliminary Injunction |
| 20 CALIFORNIA STATE BAR, *et al.*, | |
| 21              Defendants. | JUDGE: MAGISTATE JUDGE LAUREL BEELER |
| 22 | DATE: SEPTEMBER 29, 2020 TIME: 9:30 AM |

23

24

25

26

27

28

{00606140.DOCX 2}

**Case No.: 3:20-cv-06442-LB**
**PLAINTIFFS' [PROPOSED] SURREPLY IN SUPPORT OF TRO AND PRELIMINARY INJUNCTION**

Plaintiffs have reviewed the declaration of Amy Nuñez in support of the Defendant State Bar's opposition to Plaintiffs' motion for a TRO and PI filed Friday, September 25, 2020. ECF 48. Plaintiffs appreciate that there are logistical challenges for the State Bar to implement additional proctoring methods the week before the bar exam for a group of test takers whom the State Bar has disregarded and discriminated against for months.[1] Here, as in *Stiemel*, "Defendants' own delay is a primary cause of the burden they now claim. The state cannot avoid its duties "by painting itself into a corner and then lamenting the view." *Steimel v. Wernert*, 823 F.3d 902, 918 (7th Cir. 2016).

In any event, Plaintiffs reiterate that Plaintiffs can take the exam remotely using the existing ExamSoft proctoring methods. The same is true for the 79 disabled test takers who need a paper exam, the 7 disabled test takers who need paper scratch paper, and the 17 disabled test takers who need unscheduled bathroom breaks. <u>There is nothing about the existing proctoring methods that prevents Plaintiffs and the other 103 test takers from testing remotely with ExamSoft just like nondisabled test takers</u>. The videos of their test sessions may look a little different. They may be "flagged" by the AI and then cleared through the State Bar's secondary review based on their disabilities and testing accommodations. But this does not prevent Plaintiffs and additional disabled test takers from participating in the remote administration with ExamSoft alone, just like nondisabled test takers participating in the remote administration of the exam.

Plaintiffs' counsel must counter and attempt to resolve any affirmative defenses. But the alternative and secondary proctoring methods discussed in Plaintiffs' briefs and expert declarations are not necessary to the Plaintiffs' ability to test remotely. Such modified proctoring is discussed to respond to Defendants' purported fundamental alteration defense.  The fundamental alteration defense does not apply here. *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 733 (9th

---

[1] On April 27, 2020, the California Supreme Court postponed the July bar exam to September 2020, and directed the California State Bar to "make every effort possible to administer that examination online with remote and/or electronic proctoring."  On July 16, 2020, the California Supreme Court rescheduled the Bar Exam for October 5-6, 2020, and reiterated its direction that the California State Bar implement a remote administration of the Bar Exam.  But no one with the State Bar reached out to Zoom, Prometric, ProctorTrack, or Mettl to until August 26, September 21, and September 25, 2020 – *five months after* the California Supreme Court's directive. Nuñez Decl. ¶ 12, 15, 18, 33.

Cir. 1999); *Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002). And if the Court nevertheless determines that it does, the burden of proving the defense is on Defendants.  *Colorado Cross Disability Coal. v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999, 1003 (10th Cir. 2001); *Reidy v. Cent. Puget Sound Transit Reg'l Auth.*, No. C13-536RSL, 2014 WL 7340373, at *4 (W.D. Wash. Dec. 22, 2014).

Defendants have not demonstrated that alternative or secondary proctoring is necessary to prevent any fundamental alteration.  The existing remote administration, with ExamSoft as the proctor, can include the Plaintiffs and additional disabled test takers. Test takers who have been approved for unscheduled bathroom breaks due to disability can announce their need to go to the bathroom to the webcam, an announcement captured on video by ExamSoft, and then take a bathroom break. This is the method being used by the DC bar. If requested by the State Bar, these test takers can scan their bathroom at the beginning of the test day before their webcam, again captured on video by ExamSoft. The paper exams can be delivered to disabled test takers in sealed envelopes by courier or overnight mail or by secure file transfer. Disabled test takers who need paper exams can open their envelopes or print their exams in front of the webcam, again captured on video by ExamSoft, and then use the paper exams during the test. Disabled test takers who need physical scratch paper can use their webcam to scan both sides of the pages prior to each test session, captured on video by ExamSoft, as is being done for all remote test takers for the performance test. Defendants can rely on the attestations of test takers with disabilities that they will not cheat, as is done for all remote test takers.[2] Paper answers (e.g. hand-marked MBE answers) can be returned by courier or overnight mail or by uploading images of the answers. Images of hand-marked pages can be taken on smartphones in front of the webcam. Paper exam questions can be returned by courier or overnight mail. The risk of stealing exam questions is present for all test takers.

Nevertheless, given Defendants' assertions about fundamental alteration since the beginning of Plaintiffs' counsel's advocacy in this matter, Plaintiffs' counsel have investigated and proposed alternative and secondary proctoring solutions for disabled test takers who need to use paper copies of

---

[2] *See* Klausner Decl., ECF 44-2 ¶ 46 ("Signed codes of conduct are well known tools to increase compliance with rules.").

the exam or paper scratch paper. Through this investigation, Plaintiffs have demonstrated that secondary human proctoring can be added on top of ExamSoft as needed for the work or desk areas containing paper copies of the exam, feasibly and in time for the exam. *See* Center Decl., ECF 6-5; Gonzalez Decl., ECF 23; Kim Reply Decl., ECF 47-2; Gonzalez Reply Decl., ECF 47-8; *accord* Hill Decl., ECF 43. The secondary proctoring can occur through a Zoom link directed at the desk area and set up through the test taker's smartphone or second laptop. As Plaintiffs have demonstrated, Zoom is being used for proctoring – the only method of proctoring – during other state bar exams, Center Decl., ECF 6-5, Exhs. B, D, a fact to which Ms. Nuñez does not respond. The secondary human proctors can remote proctor multiple test takers simultaneously, as described in the declarations. The third-party vendor Mettl is available to provide up to 20 additional trained proctors to serve as secondary Zoom proctors, should more proctors be needed. Permitting 103 test takers to test remotely will free up proctors for the in-person administration, who can be reassigned to remote proctoring (which is also safer for the proctors). But again, secondary or alternative proctoring is not necessary for the Plaintiffs to test remotely. It is a response to Defendants' asserted fundamental alteration defense.

Since filing their replies, Plaintiffs have had an opportunity to review the two sources contained in footnotes 18 and 20 of Dr. Klausner's declaration. The first source in footnote 18 underlies the numeric risks that Dr. Klausner calculated mathematically and stated at paragraphs 55 through 56. The second source in footnote 20 is the basis for the numeric risk stated in paragraph 57. The two sources – one co-authored by Dr. Klausner – are not peer reviewed. Each is published with a disclaimer as follows:

> Estimation of Individual Probabilities of COVID-19 Infection, Hospitalization, and Death From A County-level Contact of Unknown infection Status
> Rajiv Bhatia, Jeffrey Klausner
> doi: https://doi.org/10.1101/2020.06.06.20124446
>
> **This article is a preprint and has not been peer-reviewed [what does this mean?]. It reports new medical research that has yet to be evaluated and so should *not* be used to guide clinical practice.**

(Bolding, color, and italics in original at

https://www.medrxiv.org/content/10.1101/2020.06.06.20124446v2.

Household transmission of SARS-CoV-2: a systematic review and meta-analysis of secondary attack rate

Zachary J. Madewell, Yang Yang,  Ira M. Longini Jr., M. Elizabeth Halloran, Natalie E. Dean

doi: https://doi.org/10.1101/2020.07.29.20164590

**This article is a preprint and has not been peer-reviewed [what does this mean?]. It reports new medical research that has yet to be evaluated and so should *not* be used to guide clinical practice.**

(Bolding, color, and italics in original at

https://www.medrxiv.org/content/10.1101/2020.07.29.20164590v1.) Nowhere did Dr. Klausner indicate or suggest that his risk calculations stated in paragraphs 55 through 57 were based on research that has not yet been peer-reviewed, and that has been published with the specific disclaimer that it should not be used to guide clinical practice.[3] In fact, there is a dearth of reliable data about the impact of COVID-19 on people with disabilities.[4]

Respectfully submitted,

Dated:  September 28, 2020                    By:  _____/s/_____

Claudia Center, Counsel for Plaintiffs

---

[3] The risk levels that Dr. Klausner calculates are comparable to and at times higher than the risks that many people find important and take steps to avoid. *See, e.g.*, Julie Fox, *et al.*, "Quantifying sexual exposure to HIV within an HIV-serodiscordant relationship: development of an algorithm," 25 AIDS 1065-1082 (2011) (discussing various per-contact risks by type of contact with ranges 0.04-3.0%, 0.04-0.0.32%, 0.06-0.056%, 0.01-0.14%, 0-0.04%, and 0-0%); Fengyi Jin, *et al.*, "Per-contact probability of HIV transmission in homosexual men in Sydney in the era of HAART," 24 AIDS 907-913 (2010) (describing various per-contact risks at 0.11, 0.62, 0.65, and 1.43); Marie-Claude Boily, "Heterosexual risk of HIV-1 infection per sexual act: systematic review and meta-analysis of observational studies," 9 Lancet Infect. Dis. 118-29 (2009) (discussing per-contact risk compiled from 35 studies as 0.182%).

[4] *See* Nicholas S. Reed, *et al.*, "Disability and COVID-19: who counts depends on who is counted," www.thelancet.com/public-health Vol 5 (August 2020) (correspondence) ("Without disability data, a large proportion of the high-risk population remains untracked and testing rates unknown. Inaccurate data creates unreliable risk estimates …"), https://doi.org/10.1016/S2468-2667(20)30161-4; "The COVID-19 pandemic and people with disability," Elsevier (2020) (editorial) ("[W]e have learned also how much we still don't know about the virus. … Information about the effect of COVID-19 on people with disability is now due."), https://doi.org/10.1016/j.dhjo.2020.100944; Coleen A. Boyle, PhD MS, *et al.*, The public health response to the COVID-19 pandemic for people with disabilities," Disability and Health Journal 13 (2020) (commentary) ("Unfortunately, there is little information that allow public health experts to break out the impact on PwDs."), https://doi.org/10.1016/j.dhjo.2020.100943; *see also* Jayajit Chakraborty, "Social inequities in the distribution of COVID-19: An intra-categorical analysis of people with disabilities in the U.S.," Elsevier (2020) (finding increased risk for Hispanic people with disabilities), https://doi.org/10.1016/j.dhjo.2020.101007; Andreas Hoefera, *et al.*, "Case Report: Management of a COVID-19 outbreak in a hotel in Tenerife, Spain," International Journal of Infectious Diseases 96 (2020), https://doi.org/10.1016/j.ijid.2020.05.047.